973 A.2d 841

**SAXON MORTGAGE SERVICES, INC.**

v.

**Paula HARRISON et al.**

**No. 891 Sept.Term, 2008.**

Court of Special Appeals of Maryland.

June 11, 2009.

230

232

Adam Hiller & Rita Ting–Hopper (L. Darren Goldberg, Draper & Goldberg, P.L.L.C., on the brief), Leesburg, VA, for Appellant.

C. William Clark (Nolan, Plumhoff & Williams, Chartered, on the brief), Towson, MD and William L. Stauffer, Jr. (Thomas J. McKee, Jr., Williams Mullen, P.C., on the brief), McLean, VA, for Appellee.

Panel: DAVIS, WOODWARD and CHARLES E. MOYLAN JR. (Retired, Specially Assigned), JJ.

DAVIS, Judge.

On July 27, 2006, Saxon Mortgage Services, Inc., appellant, filed a complaint in the Circuit Court for Frederick County, asserting claims of conversion and negligence against Middleburg Bank and Chesapeake Bank of Maryland (Chesapeake Bank), appellees, in relation to payment of a $140,000 check issued by Joint Insurance Association (JIA), which appellant, as a co-payee, neither indorsed nor authorized to be indorsed

on its behalf. Appellant's complaint further alleged breach of contract on the part of JIA and asserted claims of conversion, fraud, intentional misrepresentation and breach of contract against Paula Harrison and Steven Siegel. On November 13, 2006, the negligence claim against Chesapeake Bank was dismissed. On June 21, 2007, the circuit court entered default judgments against Harrison and Siegel, neither of whom are parties to this appeal. On October 4, 2007, the circuit court awarded summary judgment in favor of JIA on the breach of contract claim. In addition, on October 4, 2007, the circuit court stayed a cross claim filed by Chesapeake Bank against Middleburg Bank.

On October 31, 2007, the circuit court entered an order granting appellees' motions *in limine* and precluding appellant from introducing evidence at trial that appellant first disclosed after the discovery deadline. The circuit court subsequently denied appellant's motion for reconsideration of that decision.

A bench trial on the conversion claims against appellees and the remaining negligence claim against Middleburg Bank commenced on May 6, 2008. At the close of appellant's case-in-chief, the circuit court granted judgment in favor of appellees on all counts and denied appellant's motion for judgment on the conversion claims. Appellant appeals from the judgments against it[1] and presents four questions for our review, which we have rephrased, reordered and consolidated as follows:[2]

---

1.  Chesapeake Bank filed a motion in this Court to dismiss appellant's appeal, arguing that the judgments from which appellant appealed were neither final nor appealable, in light of Chesapeake Bank's pending cross claim against Middleburg Bank. Chesapeake Bank further argued that an August 8, 2008 order by the circuit court granting appellant's Motion for a Determination of Order of Final Judgment *Nunc Pro Tunc* was erroneously issued. On November 10, 2008, we denied Chesapeake Bank's motion without prejudice to seek such relief in its brief to this Court, which Chesapeake Bank has declined to do.

2.  Appellant's questions were originally phrased as follows:

    1.  Whether the circuit court correctly denied [appellant's] complaint for conversion against [appellees] because [appellant] allegedly failed to present evidence of damages.

I.   Did the circuit court abuse its discretion by precluding appellant from using evidence that it first disclosed after the court-ordered discovery deadline?

II.  Did the circuit court erroneously conclude that appellant, one of multiple payees of a check, had the initial burden, under § 3–420(b) of the Commercial Law Article,[3] of proving its actual interest in the proceeds of the instrument?

III. Did the circuit court err by granting appellee Middleburg Bank's motion for judgment on appellant's negligence claim on the grounds that appellant failed to adduce expert testimony regarding banking industry standards?

For the reasons that follow, we answer the first question in the negative and the second and third questions in the affirmative. Accordingly, we affirm the circuit court's judgment in relation to appellant's discovery violations but reverse the circuit court's judgments in favor of appellees on appellant's conversion and negligence claims.

## PROCEDURAL & FACTUAL BACKGROUND

This case involves claims of conversion and negligence brought by a payee against a depositary bank and a payor bank in relation to the payment of a check bearing a forged indorsement. An agreed stipulation of facts, which was jointly

---

2. Whether the circuit court correctly denied [appellant's] motion for judgment against [appellees] for liability for conversion.

3. Whether the circuit court erred by granting Middleburg Bank's motion for judgment on [appellant's] negligence claim because [appellant] did not offer evidence of banking industry standards by expert testimony.

4. Whether the circuit court abused its discretion in entering the order *in limine* and in denying [appellant's] motion for reconsideration of the order *in limine.*

**3.** Unless otherwise specified, our discussion of the Commercial Law Article shall refer to Md. Code (2002 Repl. Vol., 2008 Supp.), Commercial Law (C.L.).

submitted at trial by appellant and appellees, provides the following factual background:

JIA provided insurance coverage on a property located at 123 Ninth Avenue in Brunswick, Maryland, pursuant to the terms of an insurance policy. Appellant was listed on the "Declarations Page" of the insurance policy as the "first mortgagee and/or loss payee." Harrison and Siegel were named as the insureds on the insurance policy. On the same "Declarations Page," the insurance policy also identified American General Financial Services (American General) as the "second mortgagee and/or loss payee."

Following an April 27, 2005 fire on the property, Harrison and Siegel submitted an insurance claim to JIA in relation to the fire loss. After adjusting the claim, JIA determined that it would pay the $ 140,000 policy limit for damage to the property, pursuant to the terms of the insurance policy. Consequently, on May 13, 2005, JIA, the drawer,[4] issued a check in the face amount of $140,000, made payable to the order of "PAULA HARRISON and STEVEN SIEGEL and SAXON MORTGAGE SERVICE and AMERICAN GENERAL FINANCIAL SERVICES ITS SUCCESSORS, AND/OR ASSIGNS, ATIMA." JIA included appellant on the check because appellant was named as the first mortgagee and/or loss payee under the insurance policy. American General was also named by JIA as a co-payee because of its status as the second mortgagee and/or loss payee under the insurance policy. The parties stipulated that the term "ATIMA" stood for the phrase, "as their interests may appear."

JIA's adjuster, Joe Zynel, hand-delivered the check to Harrison. On May 19, 2005, the law firm of Dunlap Grubb Weaver and Whitbeck, P.C. (the Dunlap Firm) endorsed the check and presented it for deposit to Middleburg Bank in Leesburg, Virginia, thus casting Middleburg Bank in the role

---

4. C.L. § 3–103(a)(3) defines "drawer" as "a person who signs or is identified in a draft as a person ordering payment." *See also* C.L. § 3–104(f)(i) (defining "check" as "a draft, other than a documentary draft, payable on demand and drawn on a bank").

of "depositary bank," as far as the subject check is concerned, from that point forward.[5] Although the stipulation of facts does not explain why the Dunlap Firm, which has never been a party to this case, endorsed the check, appellant's opening statement at trial suggested that Harrison may have endorsed the check to an attorney at the Dunlap Firm. The Dunlap Firm also held an account at Middleburg Bank.

Although appellant neither indorsed the check nor authorized any person to indorse the check on its behalf, the word "Saxon" was handwritten on the back of the check. Middleburg Bank accepted the check for deposit, without contacting either appellant or JIA to confirm the validity of the purported indorsement. Middleburg Bank delivered the check to its intermediary bank. The check was ultimately transferred through the Federal Reserve Bank to Chesapeake Bank, where Chesapeake Bank electronically debited $140,000 from JIA's account. Chesapeake Bank thus became, for our purposes, the drawee, or payor, bank.[6] A sum of $140,000 was ultimately credited to the Dunlap Firm account at Middleburg Bank.

Upon learning that the check was deposited and paid without appellant's indorsement, appellant contacted JIA and requested that JIA offer appellant a replacement payment for the check. Once JIA became aware that appellant neither indorsed nor authorized indorsement of the check and that appellant had never received any of the proceeds of the check, JIA contacted Chesapeake Bank, which informed JIA that Middleburg Bank had accepted the check as if it were fully indorsed. Chesapeake Bank refused JIA's demand to credit its account for $140,000. JIA, in turn, declined appellant's request for a replacement payment.

---

**5.** Pursuant to C.L. § 4-105(2), a depositary bank is the first bank to take an item, even though it is also the payor bank, unless the item is presented for immediate payment over the counter. *See also Chicago Title Ins. Co. v. Allfirst Bank*, 394 Md. 270, 282, 905 A.2d 366 (2006).

**6.** A "payor bank" is the bank that is the drawee of a draft. C.L. § 4–105(3). A "drawee" is defined as a "person ordered in a draft to make payment." C.L. § 3–103(a)(2).

After appellant filed its complaint in this case, Middleburg Bank instituted an action against Harrison, Siegel and the Dunlap Firm in the Circuit Court for Loudoun County, Virginia. That action was still pending at the time of trial.

A series of pretrial proceedings disposed of various claims originally filed by appellant and the case proceeded to trial on (1) appellant's conversion claims against Middleburg Bank and Chesapeake Bank, under the Maryland Uniform Commercial Code, and (2) appellant's negligence claim against Middleburg Bank. Evidence was adduced establishing that, in September 2003, Harrison granted a deed of trust on the property to First Franklin Financial Corporation, a Delaware corporation, which, in turn, loaned Harrison $153,000. Appellant's Senior Claims Representative, Paul McAllister, testified during his deposition that First Franklin Mortgage Loan Trust 2003–FF5 assigned the deed of trust and note[7] to Wells Fargo Bank National Association (Wells Fargo Bank), which then held the note and deed of trust in a "trust" capacity. McAllister further testified at trial that appellant was the mortgage servicer for Wells Fargo Bank and was responsible for obtaining the insurance money paid by JIA on this insurance claim. Appellees disputed appellant's interest in the check and the amount of damages incurred by appellant as a result of the payment on the check.

Additional facts shall be discussed, as required, throughout the remainder of this opinion.

## LEGAL ANALYSIS

### I

### Discovery Violations & Exclusion of Evidence

Appellant assigns error to the circuit court's decision to grant appellees' motions *in limine*, precluding appellant from

---

7. For the sake of simplicity, we shall hereafter refer to both the deed of trust and the note as the "mortgage" on the property. Although mortgages and deeds of trust are different types of instruments, they are often treated the same for purposes of appellate review. *See Legacy Funding LLC v. Cohn*, 396 Md. 511, 513 n. 1, 914 A.2d 760 (2007).

introducing, in any proceeding before the court, any reference to certain documents and information produced by appellant after July 20, 2007, the deadline by which discovery was to have been completed. Appellant further challenges the circuit court's denial of appellant's Motion for Reconsideration, which requested that the circuit court reconsider its ruling granting appellees' motions *in limine*. In order to address the merits of appellant's arguments, we first review the timeline of events forming the backdrop of the discovery dispute between the parties.

## A

### Discovery Deadlines

Appellant's complaint was filed on July 27, 2006.[8] Throughout 2006, various pre-trial matters were submitted to and addressed by the court. On March 21, 2007, the circuit court entered a scheduling order requiring that discovery be completed at least seventy-five days prior to the August 21, 2007 trial date or by June 7, 2007. On May 14, 2007, the circuit court extended the discovery deadline to July 7, 2007. In a subsequent order, the circuit court extended the discovery deadline to July 20, 2007.

## B

### Discovery Requests & Motion for Protective Order

On June 6, 2007, Middleburg Bank propounded interrogatories and served a request for production of documents on appellant. On June 28, 2007, Middleburg Bank served a notice of deposition, expressing its intent to depose appellant's corporate designee. Through these combined discovery requests, Middleburg Bank sought the disclosure of information pertaining to the following topics:[9]

---

**8.** Appellant's complaint was subsequently amended on September 26, 2007.

**9.** These "topics" were expressly set forth in an exhibit to Middleburg Bank's Notice of Deposition. In addition, in Interrogatories 1(i)

1. The purported assignment of (a) the Adjustable Rate Note dated September 22, 2003, attached as Exhibit A to the Complaint ("Note") and (ii) Deed of Trust dated September 22, 2003, attached as Exhibit B to the Complaint ("Deed of Trust") to Wells Fargo Bank National Association, as Trustee ("Wells Fargo") for First Franklin Mortgage Loan Trust 2003–FF5 ("FF Trust");

2. All communications between [appellant] on the one hand, and First Franklin Financial Corp., Wells Fargo, and/or FF Trust, on the other, concerning the Note and/or the Deed of Trust;

3. The purported "attorney-in-fact" relationship between [appellant], on the one hand, and Wells Fargo and/or FF Trust, on the other;

4. [Appellant's] purported status as the current "holder of the Note;"

5. All communications between [appellant], on the one hand, and defendants, Paula M. Harrison ("Harrison") and/or Steven H. Siegel a/k/a Steven H. Seigel ("Siegel"), as well as their agents and representatives, on the other, concerning, (a) the Note, (b) the Deed of Trust, (c) any application by Harrison to refinance prior indebtedness secured by the Property (for the purported purpose of refinancing an existing Deed of Trust recorded in Liber 2110 folio 555), (d) insurance coverage for the Property, (c) the fire that occurred on or about April 27, 2005 ("Fire") at that property located at 123 Ninth Avenue, Brunswick, Maryland ("Property"), (f) any proof of loss concerning the Fire, (g) that $140,000 JIA check dated May 13, 2005 ("Check"), (h) restoration of

---

through (v) of Defendant Middleburg Bank's First Set of Interrogatories, appellant's request to "identify each person with knowledge or information concerning" the aforementioned "topics" merely restated the first five of those "topics" verbatim. Middleburg Bank's first set of requests for production of documents further asked appellant to produce documents referred to by appellant in answering these interrogatories.

the Property and/or (i) breach of the Note and/or the Deed of Trust.

* * *

10. [Appellant's] relationship or arrangement with First Franklin or FF Trust regarding the Note, the Deed of Trust, and the Complaint; and

11. [Appellant's] purported damages, including any claim for attorney's fees and costs.

On July 6, 2007, appellant also filed a Motion for a Protective Order, pursuant to Maryland Rule 2–403, alleging that appellant was prohibited from providing Middleburg Bank with responses to its discovery requests. Specifically, appellant argued that Middleburg Bank sought the disclosure of "private financial information about [appellant's] customer with third parties," information that was, according to appellant, protected under the "Gramm–Leach–Bliliey [sic] Act, 15 U.S.C. Section 6801 *et. al.* [sic]"[10] Appellant asked the court to enter an order "striking all discovery request [sic] for financial information related to [appellant's] customer."

On July 16, 2007, appellant filed "[Appellant's] Responses to ... Middleburg Bank's First Set of Interrogatories," in which it raised a general objection to the interrogatories "to the extent that they seek information [that] is protected by the Gramm–Leach–Bliliey Act, 15 U.S.C. Section 6801 *et al.*" Additionally, appellant asserted that Middleburg Bank's interrogatory requests attempted to obtain irrelevant information "which is not likely to lead to the discovery of any admissible evidence." Notwithstanding these objections, appellant indicated that "various employees of [appellant] has [sic] information concerning the above listed topics" and that, "[m]ore specifically," Paul McAllister, appellant's Senior Claims Rep-

---

10. The provisions of this federal statute are not set forth or explicated in the written submissions to this Court. For reasons that shall soon become clear, we need not address the applicability of the federal statute to this case.

resentative, had information or knowledge concerning appellant's complaint.

## C

### Deposition of Appellant's Corporate Designee

On July 19, 2007, one day before the discovery deadline, appellees deposed McAllister, who testified at the deposition in his capacity as appellant's corporate designee. Appellant's counsel noted that the circuit court had yet to rule on the pending Motion for Protective Order:

> Before—before we start with [Chesapeake Bank's counsel and JIA's counsel], I—the notice of deposition was only sent by Middleburg. I don't have any objection to you asking questions. Just so that you know that we did file a motion of protective order and so we are going to object to any line of questioning regarding any private financial information which relates to the borrower Paula Harrison. So refrain from asking those questions as long as—and we also filed an objection as to any line of irrelevant questions, not that you would ask any, but just so that it would be limited to the allegations of the complaint and notice.

As forewarned, appellant's counsel objected to deposition questioning that she characterized as being subject to the pending Motion for Protective Order. Notably, appellant's counsel did not object when McAllister testified that (1) he was "never given a copy of the adjuster's report of damages to know what the total amount of the damages were," (2) he never tried to determine whether $140,000 could have rebuilt a house on the subject property and (3) he had no knowledge of any damages that his company claimed in the lawsuit. Similarly, appellant's counsel declined to object when McAllister testified that (1) appellant was not the holder of the note but rather a "servicer" to Wells Fargo Bank, who acted in its capacity as trustee for First Franklin Mortgage Loan Trust 2003–FF5 and (2) he did not know whether a power of attorney existed between Wells Fargo and appellant as it pertained to the Paula Harrison note.

## D

### Post–Discovery Deadline Disclosures

On August 7, 2007, approximately eighteen days after the July 20, 2007 discovery deadline, the circuit court denied appellant's pending Motion for Protective Order.[11]

On August 3, 2007, fourteen days after the close of discovery, but four days prior to the court's denial of the Motion for Protective Order, appellant served a copy of its Motion for Summary Judgment on the parties to this case.[12]   Appellant argued, *inter alia*, that summary judgment should be granted against appellees on the conversion claims and against Middleburg Bank on the negligence claim.   In support of its argument, appellant attached a notarized affidavit that was *dated* August 1, 2007 (twelve days after the close of discovery) and signed by Michael McCreary on behalf of appellant.   In this affidavit, McCreary attested that the value of the property decreased from $215,000 before the fire to $50,000 after the fire.   McCreary further asserted that Harrison was in default of her mortgage loan, which had a payoff amount, at the time of the affidavit, of $213,034.33.   In addition, McCreary attested that (1) the note and deed of trust on the Property were held by First Franklin Corporation with a corporate assignment to Wells Fargo Bank National Association, First Franklin's trustee and (2) appellant was Wells Fargo's attorney-in-fact.

On August 13, 2007, appellant filed its opposition to summary judgment motions submitted by appellees and JIA, attaching, as an exhibit, another affidavit signed by McCreary. This affidavit, however, was dated August 10, 2007, twenty-one days after the close of discovery and three days after the circuit court issued its order denying appellant's Motion for

---

11.   This order was entered on August 13, 2007.

12.   The motion was filed on August 6, 2007, which was the deadline for filing the motion for summary judgment established in the circuit court's scheduling order.

Protective Order. This second McCreary affidavit repeated much of the same information initially presented in McCreary's first affidavit. However, rather than giving a specific figure as to the alleged debt owed on the property, the second affidavit provided that, "at the time of the fire loss on April 27, 2005, the unpaid principal, interest and payments of taxes and assessments by the mortgagee as well as all foreclosure cost was over $140,000." In addition to this second affidavit, appellant attached a signed power of attorney. Notably, this power of attorney was created on July 20, 2007, the day after McAllister testified at his deposition that he did not know if a power of attorney existed between appellant and Wells Fargo. The power of attorney purportedly gave appellant the right to act on behalf of Wells Fargo in servicing mortgage loans.

This phase of the discovery dispute timeline is critical to our analysis. In its appeal to this court, appellant repeatedly emphasizes that it waited to disclose the "supplemental discovery" until after the circuit court ruled on its pending Motion for Protective Order:

> The discovery deadline, according to a consent order, was July 20, 2007. The [circuit court] did not rule upon the Motion for Protective Order until August 13, 2007, which was substantially after the deadline to serve responses to the Bank's requests. After the [circuit court's] denial of the Motion for Protective Order, [appellant] served supplemental discovery documents and [a]ffidavits to the Banks which were responsive to the Bank's requests.

Appellant's position is not supported by the record. To be sure, McCreary's second affidavit was first disclosed after the denial of appellant's Motion for Protective Order. However, appellant neglects to mention the existence of McCreary's first affidavit, which was created and filed *after* the discovery deadline but *before* the court's denial of appellant's Motion for Protective Order. McCreary's first affidavit disclosed information requested by Middleburg during discovery and was

nearly identical to his second affidavit.[13]

## E

## Motions *in Limine*

On August 15, 2007, JIA filed a motion *in limine*, requesting that appellant be prevented from introducing evidence regarding the mortgage debt at the time of the fire loss, a fact first disclosed by appellant in McCreary's post-discovery deadline affidavit. On August 29, 2007, Chesapeake Bank filed a similar motion *in limine*.[14] Middleburg Bank's motion *in limine*, filed on similar grounds, followed on October 15, 2007. Appellees repeated JIA's objections to appellant's post-discovery disclosure of the amount due on the mortgage and further emphasized that the power of attorney, which purportedly appointed appellant as Wells Fargo's attorney-in-fact, should also be excluded on the grounds that it was not timely disclosed by appellant despite Middleburg Bank's discovery requests. According to appellees, appellant was bound by the deposition testimony of McAllister, its corporate designee, and could not now remedy the deficiencies in his testimony, either as to damages or as to appellant's relationship to Wells Fargo, the noteholder, by producing documents subsequent to the discovery deadline.

Not surprisingly, appellant opposed these motions *in limine*, asserting, in part, that the "delayed disclosure by [appellant] related to any information regarding the debt amount *was completely due* to compliance with the Gramm–Leach–Bliley Act." Appellant stressed that, once the court ruled on its Motion for Protective Order, appellant "[was] now

---

**13.** Appellant inexplicably has failed, in its submissions, to bring to our attention the existence of this initial affidavit by McCreary. Nor did appellees, in their response, allude to this critical fact. It was only through our review of the voluminous record that we learned of the existence of this initial affidavit. The timing and substance of McCreary's first affidavit are both relevant and material to our analysis.

**14.** Chesapeake Bank filed an additional motion *in limine* on October 9, 2007, repeating the arguments raised in its previous motion.

able to disclose such information without violating the federal statute." In its opposition to the motions *in limine* filed by JIA and Chesapeake Bank, appellant added:

> Nonetheless, [JIA & Chesapeake Bank] fail to show how they are prejudiced by [appellant's] showing the amount owed on the mortgage debt after discovery. Contrary to [their] belief, the measure of [appellant's] damages does not relate to Defendant Harrison's debt amount under the mortgage loan. The Complaint is seeking damages against [appellees] based upon the value of the Check which is $140,000, not the amount due under the Note.[15]

According to appellant, McAllister's July 19, 2007 deposition testimony was not deficient. Appellant stressed that McAllister provided appellees with names of other employees who could answer specific questions and that appellees did not "bother to schedule a deposition" of those employees or file a motion to compel discovery. Appellant asserted that appellees were not prejudiced by the late disclosures.

On October 4, 2007, the circuit court granted JIA's motion for summary judgment against appellant, which disposed of appellant's breach of contract claim against JIA and denied all remaining summary judgment motions. The court also scheduled a hearing on October 25, 2007, to address the merits of the various pending motions *in limine.* On October 9, 2007, shortly after the October 4 hearing, appellant produced what appellees characterize as "[seventy-six] pages of information concerning the account of Harrison." Although those documents are not clearly identified in the record, appellant does not dispute this fact.

At the October 25, 2007 hearing on the pending motions *in limine,* the circuit court heard argument from counsel and granted appellees' motions *in limine:*

---

**15.** Appellant first filed an "Opposition to Defendant Joint Insurance Association and Chesapeake Bank's Motion *in Limine'* " on September 26, 2007. Appellant's opposition to Middleburg Bank's motion *in limine* was filed on October 23, 2007. The above-excerpted passage was taken from appellant's September 26, 2007 filing.

I quite frankly don't know what's going on with this case. When I look at all of the, that's happened, I am disturbed by the timing of things.... This suit was filed by [appellant] in July of 2006. The trial date was originally scheduled for August 21st, 200[7]. The original discovery cutoff date pursuant to the scheduling order would have been in June, some time in the very beginning of June 2007. [...] Counsel working with each other knew that they weren't gonna be able to get things done by that time and issued a consent motion to extend the deadlines to July 20th, all of which is appropriate and is reasonable. What the Court is being asked to do today is to say, to grant a motion *in limine* to prevent [appellant] from introducing an affidavit of Michael McCleer—McCreery (phonetic), dated August 10th, 2007 and the substance of those facts which apparently differ from his testimony given at deposition the day before the discovery [deadline].[16] The limited power of attorney dated July 20th, 2007, which could not have, if it was produced on July 20th, it must have been, since it was just created on July 20th it had to be created and then faxed or something over to the parties and then the documents produced October 9th, which includes the representations of counsel that that includes information regarding the attorney's fees and, and an additional loan, loan agreements, that documentation and including, I certainly agree that attorney's fees accrue up until the day of trial. However, [appellant] knew what they'd spent so far. That should have been disclosed prior to the discovery cutoff date, and it is more the substance and the timing of the affidavit of Mr. McCreery (phonetic) and after being produced as the corporate designee that is troubling to the Court. [Appellant] had an obligation to produce people with the information that is legitimately requested. [...] therefore, I'm gonna grant the motion *in limine* filed by both [appellees].

---

**16.** Appellant's counsel subsequently clarified that McAllister testified at the deposition and McCreary authored the affidavit. The circuit court was apparently not aware of the first McCreary affidavit.

The circuit court later clarified that its ruling extended only to the following:

> [The] [a]ffidavit of Michael McCreery (phonetic) including the substance of the facts contained in those documents, the limited power of attorney dated July 20th, and the 76 pages of documents produced on October 9th, 2007, any additional information or documents not disclosed by [appellant] prior to July 20th, 2007. *Anything that existed prior to that date, that all comes in.* Just granted the motion as to those items[.]

(Emphasis added).[17]  An order was entered memorializing this ruling on October 31, 2007.  The order reflected that, along with the aforementioned documents, appellant was barred from "[i]ntroducing in any proceeding before this Court evidence contrary to the testimony of its corporate designee Paul McAllister."

## F

### Motion for Reconsideration

Appellant subsequently filed a Motion for Reconsideration, on November 8, 2007, arguing that the court's order granting appellees' motions *in limine* penalized appellant for complying with a federal statute and was overbroad.  As to the breadth of the order, appellant contended that, because the order excluded the substance of all facts contained in McCreary's August 10 affidavit, the court succeeded in also excluding facts that were, according to appellant, either timely disclosed, consistent with McAllister's deposition testimony or never requested by appellees.  Specifically, as to the portion of McCreary's affidavit that stated that the foreclosure at the time of the fire loss was over $ 140,000, appellant asserted that this fact had never been requested by appellees.[18]  Appellant

---

17.  On appeal, appellant challenges only the decision to deny the affidavit and we shall focus on that accordingly.

18.  Topic 11 identified in Middleburg Bank's notice of deposition indicated that Middleburg Bank would depose appellant's corporate repre-

further asserted that under the holding of *Taliaferro v. State,* 295 Md. 376, 456 A.2d 29 (1983), the discovery sanction of precluding McCreary's affidavit in its entirety was inappropriate, because, according to appellant, the delay in disclosure was due to the court's pending disposition of the Motion for Protective Order.

Subsequent to the filing of appellant's Motion for Reconsideration, but prior to any ruling on that motion, a Scheduling Order dated November 13, 2007 extended the discovery deadline in the case to March 22, 2008. Appellant filed an amended Motion for Reconsideration, in which it alleged that, in light of the new discovery deadline, appellant's disclosures were, in fact, timely; consequently, appellees suffered no prejudice. Appellees jointly filed a motion to strike all provisions of the scheduling order, other than the provision setting the May 6–7, 2008 trial date. On December 17, 2007, in two separate orders, the circuit court granted appellees' motion to strike the extended discovery deadline and denied appellant's Motion for Reconsideration.

## G

### Trial

McAllister testified on behalf of appellant at trial. During his direct examination, appellant's counsel attempted to elicit testimony regarding the extent of damages owed to appellant as a result of the fire. McAllister was permitted to testify, over the objections of opposing parties, that appellant, as the mortgage servicer for the first lienholder of the property, was responsible for obtaining insurance money paid by JIA on the insurance claim. However, the circuit court sustained objections to his testimony as to "how" appellant was injured by the facts of this case. The circuit court noted on the record that it sustained the objection to this testimony on the grounds

---

sentative as to appellant's purported damages. At the deposition, McAllister was asked if he was aware of any damages incurred by appellant as a result of the fire. He responded that he was not.

provided by appellees' counsel, namely, that such testimony would be "inconsistent with prior testimony" and was excluded by the motion *in limine.*

McAllister subsequently testified that he recalled stating, during his deposition, that he did not know if there were any damages. When appellant's counsel asked, "When you were answering that question at the time of the deposition . . . did you mean to testify that [appellant] did not incur any damages?", the circuit court sustained objections to the question and ruled: "[McAllister] said he didn't know [if appellant sustained any damages]. Not whether they had any [damages] or not. So and in light of my, my ruling on the lim—*in limine* motion, sustain." McAllister was permitted, however, to testify that he had, at the deposition, identified the name of an individual working for appellant who had a "better idea" about the damages incurred in this case.

After further objections were lodged by appellees, the following colloquy took place:

[APPELLANT'S COUNSEL]: Okay. Your Honor, we have our opportunity to clarify his deposition testimony.

[THE COURT]: As to what issue?

[APPELLANT'S COUNSEL]: As to the issue as [sic] damages.

[THE COURT]: I'd clarify, however I ruled *in limine* after the deposition that there would not be . . .

[APPELLANT'S COUNSEL]: Any inconsistent testimony. However, what these, these questions—

[THE COURT]: And he said he didn't—

[APPELLANT'S COUNSEL]:—lead to—

[THE COURT]:—know of any damages at the time of deposition.

[APPELLANT'S COUNSEL]: Total damages. If I can have him review the, the actual question that was asked. This is not inconsistent with his testimony. He was, he did not know of any total damages.

[MIDDLEBURG'S COUNSEL]: Well, now wait—

[THE COURT]: So wait—

[MIDDLEBURG'S COUNSEL]:—this is unfair. I asked him the question do you have knowledge, Mr. McAllister, of the damages that your company claims in this lawsuit? Answer: Total damages? No sir. Question: Any damages? Answer: No sir.

\* \* \*

[APPELLANT'S COUNSEL]: Your Honor, the following question is, the following testimony is that he identified someone at Saxon with the information. At that time he did not have personal knowledge of what the total damages of—

[THE COURT]: [Appellant's counsel], I have already ruled on this issue. I will sustain that objection. I know you've raised it again so you've preserved it for the record.

On redirect examination, appellant's counsel asked McAllister if he knew of any property damage from the fire or if any repairs were made on the property after the fire. Objections to both questions were sustained by the court on the grounds that any such knowledge would be either based on hearsay or beyond the scope of redirect.

## H

### Propriety of Circuit Court's Ruling on Motions *in Limine* & Motion for Reconsideration

Appellant discusses the holding of the Court of Appeals in *Taliaferro, supra,* and argues that the circuit court abused its discretion when it precluded the use of information disclosed by appellant subsequent to the discovery deadline. Appellant further argues that, even if the circuit court properly granted appellees' motions *in limine,* the scope of the *in limine* order was "unjustifiably broad" and prevented appellant from adducing evidence as to its damages in this case. We disagree with appellant on both counts.

The circuit court granted appellees' motions *in limine* on the grounds that appellant's post-discovery disclosures should have been made available to appellees, in response to Middleburg Bank's discovery requests, prior to July 20, 2007, the discovery deadline that was agreed upon by the

parties and established by court order. We review the granting of a motion *in limine* for discovery violations under an abuse of discretion standard. *Lowery v. Smithsburg Emergency Med. Serv.*, 173 Md.App. 662, 674, 920 A.2d 546 (2007) (citing *Heineman v. Bright*, 124 Md.App. 1, 7, 720 A.2d 1182 (1998)). Trial judges are entrusted with a "large measure of discretion" in applying sanctions for discovery violations. *Id.* (citations omitted).[19] In exercising its discretion to apply discovery sanctions, a trial court must consider five factors outlined in *Taliaferro:*

> whether the disclosure violation was technical or substantial, the timing of the ultimate disclosure, the reason, if any, for the violation, the degree of prejudice to the parties respectively offering and opposing the evidence, whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance.[20]

295 Md. at 390–91, 456 A.2d 29. *See also Lowery*, 173 Md.App. at 672, 920 A.2d 546; *Heineman*, 124 Md.App. at 8, 720 A.2d 1182. While these factors frequently overlap and "do not lend themselves to a compartmental analysis," *Taliaferro*, 295 Md. at 391, 456 A.2d 29, we shall use these factors as an analytical framework within which we shall address specific arguments raised by appellant.

---

**19.** Similarly, in *Dorsey v. Nold*, 362 Md. 241, 256–57, 765 A.2d 79 (2001), the Court of Appeals explained:

> Just as there are sanctions for the violation of the discovery rules, sanctions are available for the violation of directives in scheduling orders, although they are not specified in any rule. *See Manzano v. Southern Md. Hospital*, 347 Md. 17, 29, 698 A.2d 531, 536 (1997). The offense justifying such a sanction is not just the non-disclosure itself, but the non-disclosure within the time set by the court for disclosure to occur. Apart from any actual prejudice that may be suffered by the party in not receiving the information in a timely fashion, or that may be suffered by the court if trial has to be postponed, the court is demeaned by noncompliance with its order. *See Betz v. State*, 99 Md.App. 60, 635 A.2d 77 (1994).

**20.** Although *Taliaferro* was a criminal case, we have previously concluded that these factors are applicable in civil cases and that "absent cases involving extraordinarily complex litigation, the factors must be given considerable weight." *Lowery*, 173 Md.App. at 674 n. 6, 920 A.2d 546 (citations omitted).

### *i*

## Technical v. Substantial Violation

■ Appellant concedes that the production of McCreary's affidavit and other "supplemental discovery" occurred after the July 20, 2007 discovery deadline. Appellant contends, however, that its post-deadline disclosures represent "technical" violations of the discovery rules, because the November 13, 2007 order, which "extended" the discovery deadline to March 22, 2008, rendered appellant's disclosures "technically" within the discovery period. The discovery provisions of that scheduling order, however, were stricken by the court in December 2007. Appellant's argument on this point is without merit.

There can be little doubt that appellant's belated disclosures were material and relevant to appellees' ability to prepare a defense as to the amount of damages actually suffered by appellant. Middleburg's discovery requests asked appellant to disclose the type of information contained in McCreary's affidavits. Moreover, it was in McCreary's affidavits that appellant first disclosed any evidence regarding the current amount of debt owed on the property. Prior to the discovery deadline, however, appellant never identified McCreary as an individual with knowledge pertaining to Middleburg's discovery requests.

Apart from deposing McAllister, who was identified by appellant as its corporate designee and the person with knowledge and information pertaining to Middleburg's discovery requests, it is unclear how appellees would have been able to obtain such information prior to the discovery deadline. In light of the substance of these disclosures, appellant's violation of the discovery deadline cannot be said to be merely technical.

### *ii*

## Reasons for Belated Discovery

Appellant stresses that its timely filed Motion for Protective Order was not ruled upon by the circuit court until August 7,

2007. According to appellant, it believed that disclosure of financial information relative to Harrison, the mortgagor on the property, was prohibited by the federal borrower privacy statute. Appellant further contends that it "served its additional discovery responses and information to all [appellees] after the result of the [court's] ruling on [appellant's] Motion for Protective Order."

As the preceding timeline of events delineates, we cannot credit the reason proffered by appellant in its attempt to justify its discovery violations. McCreary's first affidavit was filed *before* the court ruled on the Motion for Protective Order. The contents of McCreary's second affidavit mirrored those of his first affidavit. Appellant, therefore, cannot be said to have waited until the court's disposition of its Motion for Protective Order before disclosing the substance of McCreary's second affidavit.

Appellant has provided us with no other reason explaining its motives in delaying disclosure of McCreary's affidavits. In light of the record in this case, we are constrained to reject appellant's argument on this point and conclude that appellant's delay in disclosure was unjustified. *See Hossainkhail v. Gebrehiwot,* 143 Md.App. 716, 726, 795 A.2d 816 (2002) (observing that the court may grant "little weight" to an appellant's unsupported explanation for a discovery delay); *Lowery,* 173 Md.App. at 676–77, 920 A.2d 546 (observing that, notwithstanding attempts to justify late disclosure, information was available to appellants before discovery deadline and could have been provided to appellees).

We further observe that appellant's counsel represented to the circuit court, both in its opposition to Middleburg Bank's motion *in limine* and at the October 25, 2007 hearing on the motions *in limine,* that appellant deliberately delayed disclosing seventy-six pages of financial documents pending a resolution of various summary judgment motions. Specifically, in its opposition to the motions *in limine,* appellant stated: "[T]his court scheduled a dispositive motion hearing on Oct. 4, 2007, which possibly could have resolved all issues without trial *and*

*therefore, disclosure of additional information* (including up-dated attorney's fees and bills, tax statements and disclosure of borrower's social security number) *was delayed until the Court enforced a ruling on the dispositive motions.'"* (Emphasis added).

Appellant cannot deliberately disregard discovery orders because it anticipates the results of future summary judgment proceedings. This delay was unjustified and unreasonable. "If scheduling orders are to be permitted to be treated in such a casual fashion, why bother with them?" *Naughton v. Bankier,* 114 Md.App. 641, 653, 691 A.2d 712 (1997).

### *iii*

### Timing of Disclosure, Degree of Prejudice & Curative Postponement

The discovery period in this case was first extended, by court order, from June 7, 2007 to July 7, 2007. Another extension set the discovery deadline for July 20, 2007. Middleburg's discovery requests were served in June of 2007. McAllister's deposition was conducted on July 19, 2007. Appellees subsequently became apprised of the contents of McCreary's first affidavit on or around August 3, 2007, approximately fourteen days after the close of discovery. McCreary's second affidavit was filed along with appellant's oppositions to the summary judgment motions on August 13, 2007, approximately twenty-four days after the close of the discovery and six days following the circuit court's denial of appellant's Motion for Protective Order. The seventy-six pages of financial documents, disclosed by appellant on October 9, 2007, were made available to appellees over two months after the discovery deadline.

[5] It was not until November 13, 2007 that trial in the matter was scheduled for May 2008. However, the absence of a set trial date, in and of itself, does not necessarily equate with lack of prejudice. *See Warehime v. Dell,* 124 Md.App. 31, 49, 720 A.2d 1196 (1998). Indeed, the discovery deadline was scheduled by the court to precede the deadline for all

dispositive summary judgment motions. By delaying the disclosure of information until appellant filed or responded to the summary judgment motions, appellant deprived appellees of information upon which they may have relied in support of their case for or against summary judgment.

Moreover, Maryland Rule 2–412(d) provides that, upon notice and subpoena by a party seeking to depose a corporation, a corporate party shall designate one or more persons to testify on its behalf during depositions requested by an opposing party and that the "persons so designated shall testify as to matters known or reasonably available to the organization." Appellees both refer to the decision of the United States District Court for the District of Columbia in *Rainey v. Am. Forest & Paper Ass'n, Inc.*, 26 F.Supp.2d. 82, 94 (D.D.C.1998), wherein the Rainey Court held that, under Federal Rule of Civil Procedure 30(b)(6), the federal counterpart to Maryland Rule 2–412(d), "a corporation cannot later proffer new or different allegations that could have been made at the time of the 30(b)(6) deposition" of the corporation's designee, unless it can prove that the information was neither known nor accessible at the time.

We decline to address whether Maryland Rule 2–412 should be construed consistent with the reasoning in *Rainey* in all instances.[21] However, we agree that appellant was on notice to prepare its designee to be able to give responsive answers on its behalf. *See Wilson v. Lakner*, 228 F.R.D. 524, 528 (D.Md.2005) ("There can be no question that [Rule 30(b)(6)] imposes a 'duty to prepare the designee[ ] ... [that] goes beyond matters personally known to the designee or to matters in which that designee was personally involved.' ") (citations omitted). McCreary's affidavits presented new informa-

---

**21.** At least one other federal court has disagreed with the holding announced in Rainey. *See, e.g., A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir.2001) (observing that nothing in the advisory committee notes indicates that Rule 30(b)(6) absolutely binds a corporate party to its designee's recollection unless the corporate party demonstrates that contrary information was either not known or inaccessible at the time).

tion about the extent of the mortgage debt on the property, which was relevant in determining the extent of appellant's injury when it was prevented from recovering the insurance proceeds.[22] There is an element of unfairness inherent in allowing appellant to disclose this information after the deposition of its corporate designee and the closure of discovery, when the opposing parties have justifiably relied on the corporate designee's deposition in developing their litigation strategies.

Finally, in opposing appellees' motions *in limine*, appellant indicated that it would suffer little prejudice if the court excluded the contents of McCreary's affidavits. Specifically, appellant argued to the court that appellees "failed to show how they are prejudiced by [appellant's] showing the amount owed on the mortgage debt after discovery," because,

> [c]ontrary to [appellees'] belief, the measure of [appellant's] damages *does not relate to Defendant Harrison's debt amount under the mortgage loan.* The Complaint is seeking damages against [appellees] based upon the value of the Check which is $140,000, not the amount due under the Note.

Notwithstanding the fact that this statement ignores that appellees may have chosen to present an alternative theory of damages in this case, appellant's statement further had the effect of informing the court that the content of McCreary's affidavit, at least as it pertained to the amount owed on the mortgage, was not relevant to appellant's case.

---

22. Middleburg Bank's notice of deposition requested information regarding "[appellant's] purported damages, including any claim for attorney's fees and costs." In its Motion for Protective Order, appellant did not identify this topic as subject to the alleged privacy provisions of the federal statute. McAllister was asked at his deposition if he was aware of the damages incurred by appellant in this case. Appellant's counsel posed no objection to the question and never argued, in relation to those damages questions, that this information was privileged or protected. McAllister responded that he was unaware of the damages suffered by appellant.

■ Because the discovery violation was both unjustified and substantial in nature, and in light of the prejudice to appellees and lack of prejudice to appellant, we conclude that the circuit court did not abuse its discretion in either granting appellees' motions *in limine* or denying appellant's Motion for Reconsideration. The circuit court was evidently troubled at the nature, substance and the timing of McCreary's August 10 affidavit and other subsequent disclosures, including the power of attorney produced one day after McAllister testified at his deposition that he was unaware of any power of attorney relationship between appellant and Wells Fargo as it pertained to the Harrison note.[23] The circuit court was clearly persuaded that appellant lacked a meritorious reason justifying its discovery violations. As we have explained, it cannot be credibly argued that appellant's disclosure was delayed because the court had yet to rule on its Motion for Protective Order. In light of the foregoing discussion, we affirm the circuit court's order.

## I

### Scope of *In Limine* Order

Appellant next argues that, even if the circuit court properly exercised its discretion in granting appellees' motions *in limine*, the "language of the *In Limine* Order was unjustifiably broad because it included facts not subject to any discovery violation." Specifically, appellant argues that the order "precluded [appellant] from introducing *any* facts indicated in the Affidavit of Michael McCreary...." Appellant continues:

The Affidavit included a broad range of documents and facts which were not subject to even an arguable discovery violation, such as the following: 1) a statement that the subject mortgage loan amount was greater than the Check

---

**23.** The circuit court, in the sound exercise of its discretion, discussed only those factors it deemed essential to its opinion. "When a court exercises its discretion by balancing and weighing the rights, interests, and reasons of the parties, the court is not required to discuss each factor considered." *Hossainkhail*, 143 Md.App. at 725, 795 A.2d 816.

amount of $140,000.00 (this fact was not requested by [appellees] through discovery); 2) a copy of the corporate assignment which was attached to the Complaint; 3) a statement that [appellant] has the right to collect all mortgage and insurance payments related to the subject mortgage (this fact was disclosed within the discovery deadline and consistent with deposition testimony); 4) evidence of the value of the Property before the fire loss in January 2005 ($215,000.00) and the value of the Property after the fire loss in January 2006 ($50,000.00) (also disclosed at the deposition prior to discovery deadline).

Appellant contends that, as a result of the court's ruling, it was precluded from introducing any evidence relating to the above-mentioned matters, even though they were not, according to appellant, "subject to any discovery violation [sanction]." We see it otherwise.

Initially, we observe that the circuit court's order specifically precluded use of appellant's post-discovery disclosures and the substance of the facts contained therein, provided that those facts were not initially disclosed prior to the discovery date. The court further precluded introduction of evidence contrary to the testimony of appellant's corporate designee, Paul McAllister.[24] As for any "statement that the subject mortgage loan amount was greater than the Check amount of $140,000.00," this fact was first disclosed in McCreary's post-deadline affidavits and we have held that the circuit court did not abuse its discretion in disallowing use of this evidence.

Furthermore, in regard to appellant's allegation that it was unjustifiably precluded by the "overbroad" order from introducing evidence as to the decrease in the property's value after the fire, appellant does not address whether it attempted to introduce such evidence at trial and was prevented from doing so by the court. To be sure, the court did not permit appellant to explain "how" appellant was injured in this case.

---

**24.** Appellant does not specifically attack that portion of the order that precluded the use of evidence inconsistent with McAllister's deposition testimony.

This ruling, however, was consistent with the court's *in limine* order, in light of McAllister's deposition testimony reflecting that McAllister knew nothing about appellant's claimed damages in this case. More importantly, McAllister did offer testimony at his deposition regarding the alleged decrease in the value of the property after the fire.[25] Appellant, for its part, neglected to introduce that evidence at trial.[26] We further observe that appellant never proffered, in response to the court's rulings, that McAllister would testify to any of the matters that appellant now alleges the circuit court erroneously prevented appellant from addressing. *See, generally Smirlock v. Potomac Development Corp.*, 235 Md. 195, 203, 200 A.2d 922 (1964) ("[A] proffer is the appropriate method by which to preserve for appellate review questions with regard to evidence which is not admitted and the nature of which is not apparent from the question to which an objection may be sustained.") (Citations omitted).

In addition, as Chesapeake Bank points out, a copy of the promissory note was, in fact, introduced as a trial exhibit by Chesapeake Bank, as an attachment to various excerpts from McAllister's deposition testimony. Furthermore, while the court sustained an objection to the introduction of a certified copy of the corporate assignment from First Franklin Mort-

---

25. At his deposition, McAllister testified that a January 31, 2006 "broker's price opinion" (BPO) report stated that there had been a fire at the home, such that only the foundation remained, and valued the remaining land at $50,000. McAllister also testified that a February 13, 2005 "broker's price opinion" valued the two-story house on the property at $215,000.

26. We recognize that the court sustained objections to questions asked by appellant's counsel, on redirect examination, regarding whether there was property damage from the fire and whether repairs were made on the property after the fire. Those matters, however, are sufficiently distinct from the narrow issue of whether appellant could testify to the value of the property before and after the fire. Furthermore, the former objection was sustained on hearsay grounds, while the latter was sustained on the grounds that it exceeded the scope of redirect. The court's *in limine* order, in other words, was neither argued by counsel nor relied upon by the court in the context of these particular questions.

gage Loan Trust to Wells Fargo Bank, appellant has not explained how the court's error in precluding that document, if any, harmed appellant. The court ultimately allowed McAllister to testify as to the contents of that document and excerpts of McAllister's deposition testimony, in which he testified as to the contents of that document, were also admitted as a defendant's exhibit at trial.

Finally, appellant's assertion that it was precluded from introducing "a statement that [appellant] has the right to collect all mortgage and insurance payments related to the subject mortgage" is not supported by the record. McAllister testified, over the opposing parties' objections, that appellant was the servicer for the first lienholder in this case and was responsible for obtaining insurance money paid by JIA on the insurance claim. The parties also stipulated to the fact that appellant was named as the loss payee and mortgagee under the insurance policy. Accordingly, we perceive no error.

## II

### Motions for Judgment—Conversion

At the close of appellant's case-in-chief, the circuit court granted judgment in favor of appellees on appellant's conversion claims and denied appellant's motion for judgment on appellant's conversion claims. Additionally, the circuit court granted judgment in favor of Middleburg Bank on appellant's negligence claim. We address each of appellant's challenges to these judgments *seriatim.*

### A

### Standard of Review

Maryland Rule 2–519(a) provides that "[a] party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all the evidence." Maryland Rule 2–519(b) provides:

> When a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff or may decline to render judgment until the close of all the evidence. When a motion for judgment is made under any other circumstances, the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made.

Unlike in a jury trial, a trial judge in a bench trial considering a Rule 2–519 motion for judgment "is not compelled to make any evidentiary inferences in favor of the party against whom the motion for judgment is made." *Bricker v. Warch,* 152 Md.App. 119, 135–36, 831 A.2d 453 (2003). Accordingly,

> [appellate review] of the decision of the trial court on the evidence is governed by the "clearly erroneous" standard set out in Rule 8–131(c)[27] and the trial judge is "allowed to evaluate the evidence as though he [or she] were the jury, and to draw his [or her] own conclusions as to the evidence presented, the inferences arising therefrom and the credibility of the witnesses testifying."

*Id.* (citations omitted).

A trial court's factual findings are not clearly erroneous as long as they are supported by any competent material evidence in the record. *See Figgins v. Cochrane,* 403 Md. 392, 409, 942 A.2d 736 (2008) (citations omitted). However, " ' "[t]he clearly erroneous standard for appellate review in [Maryland Rule 8–131(c)] does not apply to a trial court's determinations of legal questions or conclusions of law based on findings of fact." ' " *L.W. Wolfe Enterprises, Inc. v. Maryland Nat'l Golf, L.P.,* 165 Md.App. 339, 344, 885 A.2d 826

---

27. Rule 8–131(c) provides that, in an appeal from an action tried without a jury, we review the judgment of the trial court on both the law and the evidence and will not set aside the trial court's judgment on the evidence unless it is clearly erroneous, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses.

(2005) (citations omitted). Rather, " 'where the order involves an interpretation and application of Maryland statutory and case law, [appellate courts] must determine whether the lower court's conclusions are "legally correct" under a de novo standard of review.' " *Id.* (quoting *Walter v. Gunter,* 367 Md. 386, 392, 788 A.2d 609 (2002)).

## B

### Appellees' Motions for Judgment on Conversion Claims

At the close of appellant's case-in-chief, appellees moved for judgment on appellant's conversion claims, arguing, *inter alia,* that appellant had failed to prove damages on the conversion counts. Appellees stressed that appellant was only one of four payees named on the instrument of the check and emphatically maintained that appellant had adduced no evidence at trial proving the degree of its actual interest in the proceeds of the check.

Appellant countered that, under § 3–420(b) of the Maryland Uniform Commercial Code, the damages in a conversion claim are presumed to be the amount payable on the instrument. C.L. § 3–420 provides, in pertinent part:

(a) The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument or (ii) a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee.

(b) In an action under subsection (a), *the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiff's interest in the instrument.*

(Emphasis added). Appellant contended that, by producing the converted check, it was entitled to the presumption that the measure of damages was $140,000, or the amount payable on the check. Thus, appellees had the burden, according to appellant, of rebutting that presumption by establishing that appellant was entitled to less than that amount.

The parties also made various alternative arguments. Chesapeake Bank, for example, asserted that, even if appellant correctly interpreted C.L. § 3–420(b), appellees had sufficiently rebutted the statutory presumption by highlighting the deposition testimony of McAllister, wherein he stated that he had no knowledge of any damages incurred by appellant. Appellant argued that the "Declarations Page" in the insurance policy designated appellant as the first loss payee and American General as the second loss payee, evincing an intent to give appellant an interest in the policy senior to that of American General, another co-payee on the check. Appellant also argued that, because the three other co-payees validly endorsed the check, they "endorsed away their interests and so as a practical matter the check was negotiable only upon the endorsement of [appellant]," such that "at the time that it was presented to Middleburg Bank for negotiation the interest was owned by [appellant]."

The circuit court granted appellees' motion for judgment on the conversion counts, rejecting appellant's interpretation of C.L. § 3–420(b):

I have no evidence of damages. None. And 4, ah, 3–420(b) makes it clear, and I'm gonna read from the comment that there does need, *there is a presumption that the amount of damages, that the amount of [sic] is the amount of the check, but it's different in the case of co-payees.* And I'm reading right from the official comment. The but clause in subsection B, I will note it doesn't refer back to 3–420, but that is the section it's referring to, addresses the problem of conversion actions, which is what we have here against Middleburg and against Chesapeake in multiple payee checks.

(Emphasis added). The court quoted directly from the following paragraph in Official Comment 2 to C.L. § 3–420(b):

The "but" clause in subsection (b) *addresses the problem of conversion actions in multiple payee checks.* Section 3–110(d) states that an instrument cannot be enforced unless all payees join in the action. But an action for conversion might be brought by a payee having no interest or a limited interest in the proceeds of the check. This clause prevents such a plaintiff from receiving a windfall. An example is a check payable to a building contractor and a supplier of building material. The check is not payable to the payees alternatively. Section 3–110(d). The check is delivered to the contractor by the owner of the building. Suppose the contractor forges supplier's signature as an indorsement of the check and receives the entire proceeds of the check. *The supplier should not, without qualification, be able to recover the entire amount of the check from the bank that converted the check.* Depending upon the contract between the contractor and the supplier, the amount of the check may be due [1] entirely to the contractor, in which case there should be no recovery, [2] entirely to the supplier, in which case recovery should be for the entire amount, or [3] part may be due to one and the rest to the other, in which case recovery should be limited to the amount due to the supplier.

(Emphasis added).

Ultimately, the court compared the hypothetical scenario discussed in Official Comment 2 to the facts of this case and concluded that appellant, as a co-payee on the check, was required, at the outset, to prove its actual interest in the proceeds of the check:

Other than we have a few more parties than just the building contractor and the building supplier, that's the situation that we have here. *I have no idea what anybody's interest is in the proceeds* and I note that I did grant a motion in limine on the deposition responses of Mr. McAllister. There could have been other ways to try to prove what other people's interests were, but that was not done. I

don't know in this instance what the damages were. *They might have been 100—they probably were—but the Court cannot guess or speculate as to the possible damages and that, I mean it's just word for word right out of the comment that there is no proof of what, what the interest is.* Therefore I don't find an [sic], damages are an essential part of any cause of action and the Defendant has no obligation to prove damages. *It's the Plaintiff's obligation to prove each and every element of, of an offense and there just—of, of a charg—of a count. And there's just no evidence of that.*

(Emphasis added).

### *i*

### C.L. § 3–420(b)

The specific provision of C.L. § 3–420 that we are called upon by appellant to construe is subsection (b), which provides:

In an action under subsection (a), the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiff's interest in the instrument.

Appellant asks us to hold that C.L. § 3–420(b) establishes a rebuttable presumption that the measure of liability is the amount payable on the check and that this rebuttable presumption applies equally in conversion cases involving single or multiple payees. This issue appears to be one of first impression in Maryland.[28] Accordingly, resolving appellant's

---

**28.** Although appellant cites to *Peoples Nat'l Bank of Maryland v. Am. Fidelity Fire Ins. Co.,* 39 Md.App. 614, 386 A.2d 1254 (1978), that case sheds no light on the issue currently before us. In *Peoples Nat'l Bank,* we held that a cause of action in conversion was appropriately alleged under the predecessor statute to C.L. § 3–420(b). *Id.* at 614, 386 A.2d 1254. As appellant points out, we ultimately affirmed a trial court's award of summary judgment in favor of a co-payee "for the face amount of the check." *Id.* Appellant asserts that, by negative implication, *Peoples Nat'l Bank* stands for the proposition that a co-payee is not required to provide proof of damages beyond the face amount of the

claim requires us to construe various provisions of the Maryland Uniform Commercial Code.

The Court of Appeals reiterated the principles that inform this process of statutory analysis:

> Although we are directed by the General Assembly to construe the Uniform Commercial Code in a manner which "makes uniform the law among the various [states]" adopting it, Md. Code (1975), Commercial Law Art., §§ 1–102(1), –102(2)(c), we nonetheless utilize, in interpreting the Code, the same principles of statutory construction that we would apply in determining the meaning of any other legislative enactment. These well settled principles require ascertainment of the legislative intent, and if, as is the case here, construction becomes necessary because the terminology chosen is not clear, then we must consider not only the significance of the literal language used, but the effect of our proposed reading in light of the legislative purpose sought to be accomplished. Unlike most state statutory enactments, the U.C.C. is accompanied by a useful aid for determining the purpose of its provisions—the official comments of the Code's draftsmen. While these comments are not controlling authority and may not be used to vary the plain language of the statute, they are an excellent place to begin a search for the legislature's intent when it adopted the Code.

*Messing v. Bank of Am., N.A.*, 373 Md. 672, 684–85, 821 A.2d 22 (2003) (quoting *Jefferson v. Jones*, 286 Md. 544, 547–48, 408 A.2d 1036 (1979) (citations omitted)).

"[W]e begin our inquiry with the words of the statute, and, when the words of the statute are clear and unambiguous, according to their commonly understood meaning, we ordinarily end our inquiry there also." *Comptroller of the Treasury v. Kolzig*, 375 Md. 562, 567, 826 A.2d 467 (2003) (citing *Chesapeake & Potomac Tel. Co. v. Dir. of Fin. for*

---

check. That assertion, however, is not supported by the discussion in *Peoples Nat'l Bank*, which did not address the issue before us.

*Mayor & City Council of Baltimore,* 343 Md. 567, 578–79, 683 A.2d 512 (1996)). Additionally, we "construe a statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Moore v. State,* 388 Md. 446, 453, 879 A.2d 1111 (2005) (citing *Comptroller v. Phillips,* 384 Md. 583, 591, 865 A.2d 590 (2005)).

The plain and unambiguous language of the first clause, or "presumption clause," of C.L. § 3–420(b) establishes that, in a conversion action brought under § 3–420(a), the measure of liability is presumed to be the amount payable on the instrument. C.L. § 1–201(31) defines the terms "presumption" and "presumed" as follows:

Subject to additional definitions contained in the subsequent titles of this article which are applicable to specific titles or subtitles thereof, and unless the context otherwise requires, in Titles 1 through 10 of this article:

(31) "Presumption" or "presumed" means that the trier of fact must find the existence of the fact presumed *unless and until evidence is introduced* which would support a finding of its nonexistence.[29]

(Emphasis added). The term "presumed" in C.L. § 3–420(b) thus refers to a rebuttable presumption, which is "[a]n inference drawn from certain facts that establish a *prima facie* case, which may be overcome by the introduction of contrary evidence." BLACK'S LAW DICTIONARY 1224 (8th Ed. 2004). Rebuttable presumptions shift the burden of proof to the opposing party, where it remains until that party produces the quantum of evidence required to sufficiently rebut the presumption. *See* Maryland Rule 5–301(a) (establishing that, unless otherwise provided by statutes or the Maryland Rules, a presumption in all civil actions "imposes on the party against whom it is directed the burden of producing evidence to rebut

---

**29.** Section 3–103(d) of the Maryland Uniform Commercial Code establishes that Title 1 of the Maryland Uniform Commercial Law Code contains "general definitions and principles of construction and interpretation applicable throughout this title."

the presumption" until "the party introduces evidence tending to disprove the presumed fact").

Nothing in the language of the qualifying clause, or "but" clause, of C.L. § 3–420(b) indicates that this rebuttable presumption only applies to conversion claims involving a single payee. Rather, the "but" clause modifies or limits the preceding "presumption" clause by providing that "recovery may not exceed the amount of the plaintiff's interest in the instrument." Thus, the "but" clause reinforces that the presumption established in the preceding clause is not a conclusive, or irrebuttable, presumption of law, but rather, one that may be rebutted by evidence that the plaintiff in a conversion claim is not entitled to the full amount payable on the instrument. Stated otherwise, the presumed fact that the plaintiff's damages equal the full amount payable on the instrument remains *unless and until* evidence is introduced by the party seeking to rebut the presumption that the plaintiff's actual interest in the check entitles the plaintiff to a lesser amount.

The party against whom the presumption is directed carries the burden of producing evidence to rebut the presumption. *See* Maryland Rule 5–301(a). That party is not relieved of that burden merely because the plaintiff is a co-payee amongst multiple payees. Placing the burden on the plaintiff in a multiple payee conversion claim to prove, in the first instance, the amount of his or her exact interest in the check would obviate the need for an explicit statutory presumption as to the measure of liability. It would also require us to insert meaning into the statute that is not supported by the plain language of the statute.[30]

---

**30.** Other provisions in the Code reinforce our conclusion that the drafters would have expressly exempted multiple payee conversion actions from the presumption established in C.L. § 3–420(b) if that had, in fact, been their intent. For example, C.L. § 3–308, which addresses the required proof of signatures and status as a holder in due course in a negotiable instruments claim, provides in subsection (a):

In an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings. If the validity of a

Because the language of statute of is clear and unambiguous, we may choose to end our statutory analysis of C.L. § 3–420(b) at this point. *See Maryland Div. of Labor & Indus. v. Triangle Gen. Contractors, Inc.*, 366 Md. 407, 421–22, 784 A.2d 534 (2001) ("When the language of a statute is clear and unambiguous, . . . we normally do not look 'beyond the words of the statute itself to determine legislative intent.' ") (quoting *Giant Food, Inc. v. Dep't of Labor, Licensing & Regulation*, 356 Md. 180, 188, 738 A.2d 856 (1999)). However, because the circuit court's ruling was based upon the official comments to C.L. § 3–420(b), we shall assess the impact of those comments, if any, on our interpretation of the statute.

Official Comment 2 explains that C.L. § 3–420(b) was amended from its predecessor statute, C.L. § 3–419(2),[31] in

---

signature is denied in the pleadings, the burden of establishing validity is on the person claiming validity, but the signature *is presumed* to be authentic and authorized *unless the action is to enforce the liability of the purported signer and the signer is dead or incompetent at the time of trial of the issue of validity of the signature.* If an action to enforce the instrument is brought against a person as the undisclosed principal of a person who signed the instrument as a party to the instrument, the plaintiff has the burden of establishing that the defendant is liable on the instrument as a represented person under § 3–402(a).
(Emphasis added).

31. The predecessor statute, Md. Code Ann. (1992 Repl. Vol., 1995 Supp.), C.L. § 3–419, provided:

(1) An instrument is converted when
  (a) A drawee to whom it is delivered for acceptance refuses to return it on demand; or
  (b) Any person to whom it is delivered for payment refuses on demand either to pay or to return it; or
  (c) It is paid on a forged indorsement.
(2) In an action against a drawee under subsection (1) the measure of the drawee's liability is the face amount of the instrument. In any other action under subsection (1) the measure of liability is presumed to be the face amount of the instrument.
(3) Subject to the provisions of Titles 1 through 10 of this article concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable

order to create unified liability among drawees and other converters, the former of which had been subject, under the predecessor statute, to a "conclusive," or irrebuttable, presumption that liability equaled the face amount of the instrument:

> Subsection (2) of former Section 3–419 is amended because it is not clear why the former law distinguished between the liability of the drawee and that of other converters. Why should there be a *conclusive presumption* that the liability is face amount if a drawee refuses to pay or return an instrument or makes payment on a forged indorsement, while the liability of a maker who does the same thing is *only presumed* to be the face amount?

(Emphasis added).

The second paragraph of Official Comment 2, which the circuit court quoted and upon which the court placed dispositive emphasis in ruling on appellees' motions for judgment, does not eviscerate the "presumption" clause in multiple payee conversion actions. Rather, as the official comments explain, the "but" clause "addresses," or speaks to, "the problem of conversion actions in multiple payee checks." When read in the light cast by the plain language of the statute, these official comments explain that, where the issue of a co-payee's limited interest in the instrument *has been generated* by the opposing party, *i.e.,* where the presumption established in C.L. § 3–420(b) *has been successfully rebutted* by the opposing party, a co-payee cannot, under those circumstances, recover more than what the evidence demonstrates to be his or her interest in the instrument's proceeds, absent "qualification," or evidence, adduced by the co-payee plaintiff establishing his or her entitlement to a larger portion of the proceeds. The

---

in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.

(4) An intermediary bank or payor bank which is not a depositary bank is not liable in conversion solely by reason of the fact that proceeds of an item indorsed restrictively (§§ 3–205 and 3–206) are not paid or applied consistently with the restrictive indorsement of an indorser other than its immediate transferor.

discussion in Official Comment 2 regarding the respective interests of a hypothetical building contractor and a supplier, as co-payees, in the amount of the check merely provides one scenario illustrative of C.L. § 3–420(b). It does not, and cannot, vary the plain language of the statute.

*ii*

### Other Jurisdictions

Because the General Assembly has mandated that the Commercial Code be "liberally construed and applied to promote its underlying purposes and polices," C.L. § 1–102(1), which includes making "uniform the law among the various jurisdictions," C.L. § 1–102(2)(c), we have looked to other jurisdictions to determine how they have applied the Uniform Commercial Code's presumption as to the measure of liability in conversion actions in claims involving multiple payees. We have come across only a handful of reported opinions that are instructive.

Appellant asks us to consider two cases construing conversion claims under the predecessor statute to C.L. § 3–420, or its equivalent in a sister jurisdiction. One of these cases, *Cartwood Constr. Co., Inc. v. Wachovia Bank & Trust Co., N.A.*, 84 N.C.App. 245, 352 S.E.2d 241 (1987), *aff'd*, 320 N.C. 164, 357 S.E.2d 373 (1987), is inapposite. In *Cartwood*, a plaintiff construction company sued a depositary bank and a drawee bank. *Id.* at 242. In reversing a trial court's award of summary judgment in favor of the drawee bank, the North Carolina Court of Appeals held that, once it was established, under North Carolina's counterpart to the former C.L. § 3–419, that a drawee paid on a forged instrument, *i.e.*, that a conversion occurred, the drawee's liability was the face amount of the instrument. *Id.* at 250. The *Cartwood* Court concluded that the plaintiff's "interest in the proceeds of the check is irrelevant under this provision of the statute." *Id.* As we have observed, the official comments to C.L. § 3–420 explain that the predecessor to C.L. § 3–420 distinguished between drawees and other converters and created a conclu-

sive presumption that the measure of liability for drawees in conversion cases was the face amount of the instrument, which was later amended by the current version of the statute. *Cartwood,* therefore, is inapplicable to the facts of this case.

Appellant also asks us to consider the holding in *Northwestern Nat'l Life Ins. Co. v. Laurel Fed. Sav. Bank,* 979 F.Supp. 354, 355 (D.Md.1996), *summary judgment granted,* 979 F.Supp. 359 (D.Md.1997), *aff'd,* 133 F.3d 916 (4th Cir.1997), a case heard by the United States District Court for the District of Maryland upon motion of the defendants for summary judgment against the plaintiff on conversion claims brought under C.L. § 3–419, the predecessor statute to C.L. § 3–420. *Id.* at 355. The *Northwestern* Court examined the liability of a depositary bank for conversion of an instrument deposited therein and focused, in particular, on C.L. § 3–419(3), which expressly provided an affirmative defense for a depositary bank, limiting its liability to the "amount of the proceeds left in its hands at the time of the suit," unless the bank "failed to comply with the requirements of good faith and reasonable commercial standards applicable to banks." *Id.* at 358.[32] The *Northwestern* Court determined that the depositary bank had not complied with applicable commercial banking standards, resulting in the plaintiff's entitlement, as a matter of law, to recover the face amount of the checks. *Id.* The District Court continued, however, that the "face amounts of the checks *only presumptively* establish the plaintiffs damages under § 3–419(2)" and ordered that the parties brief the "question of damages as to those checks," after which the District Court would decide if the issue of damages would need to be tried.[33] *Id.* (emphasis added). This case demon-

---

**32.** C.L. § 3–420(c) now excludes depositary banks from this affirmative defense.

**33.** The District Court later determined, after briefing by the parties, that the defendant did not introduce such evidence as would support a finding that the plaintiff was entitled to less than the face amounts of the checks and ordered summary judgment in plaintiff's favor. *See Northwestern Nat'l Life Ins. Co. v. Laurel Fed. Sav. Bank,* 979 F.Supp. 359, 360 (1997).

strates a useful analytical approach towards applying the rebuttable presumption of damages under the predecessor statute, but does not particularly afford us a better understanding of how other jurisdictions treat counterparts to C.L. § 3–420(b) under circumstances resembling those of this case.

*Edwards v. Allied Home Mortg. Capital Corp.*, 962 So.2d 194, 205–06 (Ala.2007), a case involving a single payee, is more instructive. In *Edwards*, a trial court awarded partial summary judgment in favor of Allied Home Mortgage Capital Corporation (Allied), a mortgage brokerage company, and against Allied's former branch manager, Edwards, on, *inter alia,* a conversion claim. *Id.* at 202. The case proceeded to trial before a jury to determine the amount of compensatory damages to be awarded to Allied. *Id.* The jury ultimately awarded Allied damages for its conversion claim equaling the face value of various checks (plus prejudgment interest) that were made payable to Allied, but retained and deposited by Edwards into her personal accounts. *Id.* at 203. Edwards appealed this verdict, arguing that the trial court erred by prohibiting her from arguing to the jury that Allied's interest in the checks was less than the face value of the checks, in light of an agreement between the parties that permitted Allied to retain a small percentage of each closed loan that originated through the branch. *Id.* at 203–04. In fact, Allied's representative testified at trial that Allied would have retained only a percentage of the checks, instead of the full amount of the checks, if Edwards had forwarded them to Allied, as she was required to do. *Id. at* 204.

The Supreme Court of Alabama construed Alabama's counterpart to C.L. § 3–420(b), along with the official comment upon which the circuit court placed heavy emphasis, and rejected Allied's argument that the official comment restricted the qualifying clause, or "but" clause, to circumstances involving multiple payee checks:

> Allied's arguments on the compensatory-damages issue are not well-founded. The trial court should not have prohibited Edwards from arguing to the jury that Allied's interest in the converted checks was less than their face

value. This Court is bound by rules of statutory construction "to interpret the language of [a statute] to mean exactly what it says and to give effect to the apparent intent of the legislature." *IMED Corp. v. Systems Eng'g, Assocs. Corp.*, 602 So.2d 344, 349 (Ala.1992). The first clause in § 7–3–420(b) states that the measure of liability is presumed to be the amount payable on the instrument. Although the statute creates that presumption, the plain language in the clause that immediately follows the first clause indicates that the measure of liability is not equal to the face amount if the "recovery ... exceed[s] the amount of the plaintiff's interest in the instrument." The Official Comment to § 7–3–420(b) states that the purpose of that qualifying clause is to "prevent ... a plaintiff [with no interest or little interest in the proceeds of the check] from receiving a windfall." That Comment concludes that the amount of recovery for conversion of a check could be "depend[ent] upon [a] contract" between the parties.

Section 7–3–420(b), Ala.Code 1975, creates a rebuttable presumption that the amount of compensatory damages for conversion of a negotiable instrument is the face value of the instrument. Here, Allied presumptively established that Edwards's liability for her conversion of checks payable to Allied was $ 425,309 (*i.e.*, the face value of the converted checks). Edwards rebutted that presumption, however, when she presented testimony that, considering the rights of the parties in the agreement, Allied's "interest" in those checks was $ 64,467—the aggregate corporate fee Allied would have earned had Edwards delivered the closing checks she had retained to Allied.

*Id.* at 205–06.

Because Edwards rebutted the statutory presumption by presenting testimony regarding the extent of the plaintiff's interest in the checks, the Supreme Court of Alabama concluded that the trial court erroneously prohibited her from arguing to the jury that Allied was entitled to less than the full amount payable on the check. *Id.* at 206. In short, the *Edwards* Court expressly declined to give the "but" clause any

special significance with respect to multiple payees, ruling instead that the "but" clause qualified the preceding presumption clause, such that the statute generally created a presumption of the measure of liability that could be rebutted by evidence of a plaintiff's actual interest in the instrument.

The opinion articulated *Am. State Bank v. Union Planters Bank, N.A.*, 332 F.3d 533, 534 (8th Cir.2003), is also instructive. In *Am. State Bank*, the United States Court of Appeals for the Eighth Circuit addressed the statutory presumption in Arkansas's counterpart to Maryland's C.L. § 3–420(b), where an instrument was jointly payable to two payees:

> When one payee indorses a check that is payable jointly to two payees, and a bank pays the indorsing payee without the other's consent, Article 3 of the Arkansas Uniform Commercial Code provides that the bank is liable for conversion to the non-consenting payee. In this situation, "the measure of liability is *presumed* to be the amount payable on the instrument." ARK. CODE ANN. § 4–3–420(b) (emphasis added). The appeal in this diversity case raises the difficult question whether the bank's liability under Arkansas law is limited to the actual harm to the co-payee caused by the conversion.

*Id.* at 534.

American State Bank (ASB) of Arkansas granted a $425,000 revolving line of credit to a partnership, secured by liens on the partnership's crops and agricultural subsidy payments received by the partnership. *Id.* at 535. Between October 1999 and April 2000, a partner indorsed twenty-four checks totaling $262,330.76 and deposited the proceeds into the partnership's account at Union Planter's Bank (UPB) of Tennessee. *Id.* Although each check was jointly payable both to the partnership and ASB, reflecting ASB's liens, UPB paid the checks solely on the partner's indorsement. *Id.* The partner ultimately withdrew these proceeds from the partnership account and lost the money in his gambling ventures. *Id.* ASB subsequently sued UPB for conversion. *Id.*

In response to ASB's motion for summary judgment, submitted in ASB's conversion action against UPB, UPB presented evidence that, notwithstanding the partner's misconduct, ASB extended the term of its secured loan to the partnership and was eventually repaid for a substantial amount of the loan. *Id.* Nevertheless, the district court granted summary judgment in favor of ASB, awarding ASB damages totaling the face amount of the converted checks. *Id.* On appeal, UPB conceded its liability for conversion, but argued that the measure of its liability should be restricted to ASB's actual damages, adding that genuine issues of material fact on the damages issue rendered summary judgment inappropriate. *Id.*

▉ The Eighth Circuit Court of Appeals agreed with UPB. Addressing the issue of whether "UPB's evidence of reduced actual harm, if believed, [was] legally sufficient to rebut the presumption in § 3–420(b) that UPB is liable for the face amount of the checks," *id.*, the Eighth Circuit reflected on the relevant statutory presumption:

"Ordinarily, the proper measure of damages for conversion of property is the market value of the property at the time and place of its conversion." *McQuillan v. Mercedes–Benz Credit Corp.*, 331 Ark. 242, 961 S.W.2d 729, 733 (Ark.1998).[34] Thus, it is sensible to create a statutory presumption that the value of a converted check or other negotiable instrument is its face amount. And it is apparent that the UCC drafters had this issue in mind in creating the presumption.

*Id.* at 535–36. The Eighth Circuit observed that the cases relied upon by both parties in support of their arguments construed the irrebuttable presumption that applied to actions against drawee banks under the predecessor statute and

---

34. Similarly, the measure of damages in Maryland in an action for conversion of personal property is the fair market value of the property at the time of conversion, along with the legal interest that accrues from the time of the conversion to the date of the verdict. *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 415, 494 A.2d 200 (1985).

concluded that "there is no 'prevailing view' as to whether a bank's liability is limited to the plaintiff's actual loss, despite the presumption in § 3–420(b)." *Id.* at 536–37. Rather, according to the Eighth Circuit, "courts applying the UCC have determined when and how the presumption may be rebutted in accordance with more general state law damage principles, which of course vary from State to State." *Id.* at 537.

Arkansas state law provided that, even under the former irrebuttable presumption, a drawee bank could not be liable to the extent that the money actually reached the intended payees. *Id.* at 537. Thus, the Eighth Circuit concluded that "the § 3–420(b) presumption may be rebutted by evidence that the proceeds of converted checks in fact found their way to the intended recipient(s)." *Id.* at 537. The Eighth Circuit made no distinction between cases involving a single payee or multiple payees. The inquiry, rather, focused on the ability of a defendant in a conversion claim to rebut the statutory presumption by producing evidence of the plaintiff's actual loss. The Eighth Circuit determined that it could not rule, as a matter of law, that the payments received by ASB from the partnership were from a source sufficiently collateral to the conversion warranting a "double recovery" by ASB.[35] *Id.* at 538. The judgment of the district court was thus reversed and the case remanded for further proceedings. *Id.*

The decisions discussed *supra* collectively reinforce our holding that the plain language of C.L. § 3–420(b) creates a presumption that the measure of liability in a conversion claim, whether that claim involves multiple payees or single payees, is the full amount payable on the instrument—a presumption that may be rebutted by the introduction of evidence that the plaintiff's interest is, in fact, less than that full amount. When the C.L. § 3–420(b) presumption is so

---

**35.** The Eighth Circuit explained that, under the "collateral source" rule, "[a plaintiff's] recoveries from collateral sources do not redound to the benefit of a tort feasor, even though double recovery for the same damage by the injured party may result," if "the third-party payment [is] wholly independent of the tort feasor." 332 F.3d at 538 (citations omitted).

rebutted, a factual question is created as to the extent of the plaintiff's damages for conversion of the instrument, unless the court concludes that the evidence is legally insufficient or so conclusive that it rebuts the presumption as a matter of law. *See* Md. Rule 5–301(a).

Before ending our discussion of this issue, we must address various arguments that have been raised by the parties in anticipation of our interpretation of C.L. § 3–420(b).

Appellees argue that they have sufficiently rebutted the statutory presumption of damages by introducing the deposition testimony of appellant's corporate designee, McAllister, indicating that he had no knowledge of any damages claimed by the company in the lawsuit. Appellees place particular emphasis on the fact that JIA made the check payable to "Paula Harrison and Steven Siegel and Saxon Mortgage Service and American General Financial Services, its successors, and/or assigns, ATIMA" and that the parties stipulated that "ATIMA" stands for "as their interests may appear." According to appellees, appellant, as a mortgagee or mortgage servicer for the mortgagee, may not insure its interest in an amount greater than its actual debt.[36] Appellees maintain that appellant failed to produce any evidence as to the amount of its interest in the check, the interest of any other co-payee

---

**36.** Appellees, citing to *Rent–A–Car Co. v. Globe & Rutgers Fire Ins. Co.*, 158 Md. 169, 148 A. 252 (1930) and *Frontier Mortgage Corp. v. Heft*, 146 Md. 1, 125 A. 772 (1924), argue that appellant, as a mortgagee, may only insure its interest in the property to the extent of its debt, and may not recover insurance proceeds in an amount that exceeds the actual mortgage debt. Appellant asserts that the "Banks have attempted to cloud a simple check conversion case by raising a plethora of issues about lienholder's rights, mortgagor's rights, servicing agent's rights, and limitations on a mortgagee's insurable interest to the extent of the mortgage debt; none of these issues relate to UCC § 3–420." While we agree with appellant that the cases cited by appellees relating to a mortgagee's insurable interest do not change the statutory presumption as to the measure of liability expressly established in C.L. § 3- 420(b), it must be underscored, however, that a plaintiff's actual interest in the amount of an instrument remains a relevant and material issue. It must, however, be generated by appellees in keeping with the statutory presumption.

on the check, or the amount due on the promissory note and deed of trust held by Wells Fargo.

Appellant asserts that, even if it was required to prove its interest in the amount payable on the check, it satisfied that burden by entering into the record, by stipulation, a copy of the insurance policy, which provided that any loss payable under the policy would be paid to the mortgagee and the insured, as their interests appear. The insurance policy further provided that, if more than one mortgagee is named, "the order of payment will be the same as the order of precedence of the mortgages." According to appellant, it had priority to the insurance proceeds over American General, the second named mortgagee and loss payee.[37] In addition, McAllister testified that appellant was the servicer for the first lien holder and responsible for obtaining the insurance money paid by Joint Insurance on the insurance claim.[38]

Appellant also insists that it had a superior right to the check proceeds over the insureds, who would only be able to recover any balance in excess. Because a default judgment was entered against Harrison and Siegel, appellant posits that they effectively waived their right to oppose appellant's right to recover the check proceeds. In addition, according to appellant, because it was the only payee that did not endorse the check, it "retained the sole interest to indorse the Check and present it for payment." Finally, appellant contends that the "proper resolution of any uncertainty as to the rights of the co-payees in this instance was through the procedural vehicle of an interpleader."

---

37. As we have explained, the insurance policy identified appellant as the "first mortgagee and/or loss payee" and American General "and its successors [sic] and/or assigns, ATIMA," as the "second mortgagee and/or loss payee."

38. Appellant also argues that the circuit court erroneously prevented McAllister from testifying that Harrison owed over $140,000 on the mortgage or that the extent of damage caused by the fire exceeded $140,000. We have held that the circuit court's ruling on the motions *in limine* was proper. We decline to further address this issue.

Appellant is not required to prove the extent of its interest in the instrument unless appellees have sufficiently rebutted the C.L. § 3–420(b) presumption as to the measure of liability. We cannot determine whether appellees adduced evidence at trial sufficient to rebut this presumption and, if so, whether appellant has presented sufficient evidence demonstrating its interest in the check proceeds, without resolving certain factual disputes and weighing the evidence, particularly as it pertained to whether appellant was entitled to collect all, some or none of the insurance proceeds. In ruling on appellees' motions for judgment, the circuit court made no specific factual findings on these issues. The circuit court, having observed the presentation of appellant's case-in-chief, is in the best position to make these factual determinations.

Accordingly, we shall reverse the judgment of the circuit court and remand for a new hearing on appellees' motions for judgment as to appellant's conversion claims. Appellant, in its case in chief, presented evidence that appellees "made or obtained payment" of the $140,000 check issued by Joint Insurance Association, which appellant, as a co-payee, neither indorsed nor authorized to be indorsed on its behalf. In other words, appellant presented evidence that Middleburg Bank and Chesapeake Bank "ma[de] or obtain[ed] payment with respect to the instrument for [co-payees] not entitled to enforce the instrument or receive[d] payment." C.L. § 3–420(a.) By virtue of appellant's *prima facie* showing of conversion pursuant to § 3–420(a), on remand, the circuit court shall, in the first instance, accord to appellant the statutory presumption set forth in C.L. § 3–420(b), *i.e.,* that, as a matter of law, appellant's damages are presumed to be the face amount on that check. The burden then shifts to appellees to demonstrate that the evidence adduced during the presentation of appellant's case-in-chief establishes that appellant's interest in the instrument is less than the amount payable on the instrument. C.L. § 3–420(b).

In the event that the circuit court, upon consideration of the evidence and argument of counsel, determines that the statutory presumption *has not been rebutted* by appellees, appel-

lees' motions for judgment, based on the grounds that appellant did not prove its damages, must fail. The circuit court should then permit appellees, in their case, to present evidence of appellant's actual interest in the instrument. Consequently, in the event that the court denies appellees' motions for judgment because they have failed to rebut the presumption *that their liability is the amount payable on the instrument* pursuant to C.L. § 3–420(b), they would nevertheless be afforded the opportunity, during the presentation of their cases, to rebut the presumption.

Alternatively, assuming that the circuit court determines that appellees *have sufficiently rebutted* the statutory presumption, the burden then shifts to appellant to prove its actual interest in the instrument; the court, upon the failure on the part of appellant to prove its actual interest in the instrument, would be constrained to grant appellees' motion for judgment. Appellant, however, will only be permitted to premise its opposition to appellees' motion for judgment on the evidence it adduced in its case-in-chief. Should appellant be successful in establishing a *prima facie* case of its actual interest in the instrument, appellees cannot prevail on their motion for judgment. If, on the other hand, the court finds that the evidence adduced by appellant fails to establish its actual interest in the instrument, appellees' motion for judgment on appellant's conversion claim must be granted because of insufficient evidence of damages sustained pursuant to its claim of conversion.

## C

### Appellant's Motion for Judgment on Conversion Claims

After the circuit court granted appellees' motion for judgment, appellant asked the circuit court to grant judgment in favor of appellant on the conversion counts:

> Your Honor, with respect to the conversion claim, we were—what we would request on [appellant's] behalf is the Court does have a, an equitable jurisdiction here and the Court made clear even from the, the, the justification for

the, the Court's decision that it is quite possible if not probable that [appellant] would be entitled to something, some portion of this check. So what we were thinking would be the best idea would be if the Court could have a judgment entered on conversion that was in, was applicable to all four of the payees on this check and that the payees could then have a, an opportunity to discuss with each other exactly who had what interest. And the reason that I say that is that if the problem here, *if the only problem here is that there hasn't been enough evidence to show who has what interest in the check*, the Court has just provided a windfall to the party that converted the check to save somebody who may or may not also have an interest in the check and that can easily be resolved by just having the money paid into the registry of the court and then [appellant], American General, and the two individual payees can then have either an informal discussion or if necessary, ah, a show cause proceeding that could then divide up the interest accordingly. *Because we do believe that there is a conversion that occurred here and the fact that Saxon has not shown in the Court's view the correct proportion of the total check proceeds is probably not a good result when it is clear that the check has been converted.*

(Emphasis added). The circuit court responded, "I don't have any basis to amend on that basis. Note your request, but it's denied." Appellant argues that the circuit court erred by declining to grant judgment in favor of appellant as to its conversion claims against appellees.

C.L. § 3–110(d) provides that an instrument made payable to two more persons, jointly and not alternatively, is payable to all of the named payees and may only be negotiated or enforced if the payees act jointly. Official Comment 4 to C.L. § 3–110 explains that "[i]f an instrument is payable to X and Y, neither X nor Y acting alone is the person to whom the instrument is payable," such that neither X nor Y, acting alone, can be considered the holder or a person entitled to enforce or negotiate the instrument. In this instance, the check was made jointly payable to "Paula Harrison *and*

Steven Siegel *and* Saxon Mortgage Service and American General Financial Services, its Successors and/or Assigns, ATIMA." (Emphasis added). *See generally Dynalectron Corp. v. Equitable Trust Co.,* 704 F.2d 737, 738 (4th Cir.1983) ("If a check or other instrument is payable to 'A and B,' both payees must indorse.").

C.L. § 3–420(a) provides that an instrument is converted "if ... a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment." Official Comment 1 explains that this "covers cases in which a depositary or payor bank takes an instrument bearing a forged indorsement," along with cases where a check is made jointly payable to more than one payee but is deposited or paid without the consent of a payee. As appellant indicates, the Court of Appeals has previously recognized that the predecessor to C.L. § 3–420(a), C.L. § 3–419(1), imposed absolute liability where a party payed an instrument over a forged indorsement, because payment has been made to a person who does not possess good title. *See Citizens Bank of Maryland v. Maryland Industrial Finishing Co.,* 338 Md. 448, 452–53, 659 A.2d 313 (1995) (citing *Menichini v. Grant,* 995 F.2d 1224, 1232 (3rd Cir.1993); *Equitable Life Assur. Soc. of U.S. v. Okey,* 812 F.2d 906, 910 (4th Cir.1987); *Mid–Atl. Tennis Cts. v. Citizens Bank & Trust Co.,* 658 F.Supp. 140, 143 (D.Md.1987)).[39]

---

**39.** The Court of Appeals also recognized, however, that

[t]he exposure created by this strict or absolute liability is somewhat mitigated by § 3–419(3), which limits the liability of a bank to the proceeds that remain in the bank's hands, if the bank establishes (1) that it acted in good faith and (2) that it acted "in accordance with the reasonable commercial standards applicable to the business."

338 Md. at 453, 659 A.2d 313. The current C.L. § 3–420(c) retains this affirmative defense, although it is no longer available for depositary banks:

A representative, other than a depositary bank, who has in good faith dealt with an instrument or its proceeds on behalf of one who was not the person entitled to enforce the instrument is not liable in conversion to that person beyond the amount of any proceeds that it has not paid out.

Prior to trial, the parties stipulated that, although the check was payable jointly, appellant never indorsed the check nor did it authorize any person to do so. The parties further stipulated that Middleburg Bank, as the depositary bank, did not contact either appellant or JIA to verify the authenticity of the word "Saxon," which appeared on the check as appellant's purported indorsement. Rather, when presented with the check, Middleburg Bank deposited the proceeds into the account of the Dunlap Firm and delivered the check to its intermediary bank. The check was ultimately presented to Chesapeake Bank, the drawee bank, which electronically debited $140,000 from JIA's account and credited that amount to the Middleburg Bank account. On May 20, 2005, Middleburg Bank credited $140,000 to the Dunlap Firm's account.

In sum, a check in which appellant claims an interest was taken for deposit (in the case of Middleburg Bank) and paid (in the case of Chesapeake Bank) upon a forged indorsement and without appellant's consent. Although there is, thus, no dispute as to many of the facts essential to appellant's conversion claim, final judgment cannot be entered on appellant's motion for judgment until the circuit court resolves the damages question. Moreover, because appellant's argument in support of its motion for judgment focused almost exclusively on resolving the issue of damages, and because the circuit court appeared to have denied appellant's motion for judgment on those grounds, appellees were not afforded the opportunity to present any argument against appellant's contention that appellees were liable for conversion as a matter of law. There may be defenses that appellees are able to assert that, on this record, we are unable to discern.

Accordingly, we reverse the judgment of the circuit court insofar as it determined that appellees were not liable on appellant's conversion claims because damages were not sufficiently proven. Upon remand, the circuit court shall consider whether final judgment is appropriate in light of the court's ruling with respect to the proof of damages as to the conversion claims, as we have recounted in the preceding section. In addition, appellees shall be afforded the opportunity to argue

against appellant's motion for judgment. *See Northwestern Nat'l Life Ins. Co.*, 979 F.Supp. at 355, 358 (holding that, under the predecessor statute to C.L. § 3–420, plaintiff was entitled as a matter of law to recover.from depositary bank on two checks that were not properly endorsed and should not have been paid, but that final judgment could not be granted until the issue of damages was resolved by the trial court).

## III

### Motion for Judgment—Negligence Claim

In its motion for judgment, Middleburg Bank asserted that appellant had failed to provide any evidence regarding the standard of care governing Middleburg Bank, the sole bank against whom a negligence count was brought, which actually went to trial. Appellant countered that an expert was not required to establish Middleburg's duty of care and emphasized that the check included express instructions that all payees must endorse the check exactly as their names appeared therein. According to appellant, the fact that Middleburg Bank accepted the handwritten word "Saxon" as appellant's indorsement, while the check was made payable to "Saxon Mortgage Services," demonstrated that Middleburg Bank failed to act reasonably in taking the check for deposit. After granting appellees' motions for judgment on appellant's conversion claims, the circuit court turned to the negligence claim and ruled as follows:

> As to the negligence count. One, you need damages for negligence count as well and there's no evidence once again of damages, and two, *there is absolutely no evidence of what the standard is for [the] reasonable banking industry.* Therefore, I'm granting the mo—granting judgment for Middleburg Bank on the negligence count as well.

(Emphasis added).

On appeal, appellant argues that the circuit court erroneously granted Middleburg Bank's motion for judgment on the negligence claim on the grounds that appellant failed to offer any evidence of banking industry standards through expert

testimony. Middleburg Bank counters that expert testimony was required to establish what banking practices, procedures and standards governed its conduct, because those matters are beyond the ordinary knowledge of laypersons.

We initially observe that the circuit court's ruling did not expressly mention the absence of expert testimony as the basis for its judgment. However, the necessity *vel non* of such testimony, in order to establish the applicable standard of care, was argued by both appellant and Middleburg Bank. Moreover, neither party has argued that the circuit court did *not* base its ruling on the lack of expert testimony. Based on our review of the record, we discern that the circuit court's conclusion that there was "absolutely no evidence of what the standard is for the reasonable banking industry" referred both to (1) the absence of expert testimony specifically establishing a banking industry standard and (2) the general need to establish a banking industry standard prior to determining that Middleburg Bank failed to exercise the appropriate degree of commercial reasonableness required under the circumstances.

Turning to the merits of appellant's argument in relation to this ruling, "[t]o establish a cause of action in negligence[,] a plaintiff must prove the existence of four elements: a duty owed to him [or her] (or to a class of which he [or she] is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages." *Jacques v. First Nat'l Bank*, 307 Md. 527, 531–32, 515 A.2d 756 (1986) (citations omitted). In order to succeed on its claim for negligence, therefore, appellant was required to show that Middleburg Bank owed appellant a duty, which was breached when Middleburg Bank took the instrument for deposit upon a forged indorsement, thus injuring appellant. Assuming that Middleburg Bank, as a depositary bank, owed a legally cognizable duty of care to appellant, a co-payee—a proposition that Middleburg Bank does not appear to challenge—we agree that appellant was not required, under the facts of this case, to

elicit expert testimony to prove Middleburg Bank's standard of care. Nor was additional evidence of a specific "banking industry practice" required, under the circumstances of this case, to determine whether Middleburg Bank violated the appropriate standard of reasonable care.

Certainly, a plaintiff alleging a bank's negligence "must show that a defendant failed to exercise that degree of care which a reasonably prudent bank would have exercised under the same or similar circumstances." *Jacques*, 307 Md. at 543–44, 515 A.2d 756 (addressing whether a bank owes a duty of care to a customer in evaluating that customer's loan application). Moreover, "[a]s in any other negligence case, an industry standard, if it exists, may be proven as evidence of the applicable standard of care." *Id.* at 544, 515 A.2d 756.

Nonetheless, in *Free State Bank & Trust Co. v. Ellis,* 45 Md.App. 159, 162, 411 A.2d 1090 (1980), a case involving a negligence claim by a bank's customer against the bank, we declined to adopt a rule that "expert testimony is required in order to establish a negligent deviation from the 'commercially reasonable standard' against which the Bank's actions are to be measured. . . ." We further rejected the bank's argument that the bank's conduct, in that case, was " 'assuredly beyond the common knowledge of the jurors' ":

> Although there may be situations that necessitate expert testimony relative to the standard of care required of a bank in dealings with customers, this case is not of that category. Certainly, no expert testimony was needed to show that banks do not ordinarily release the collateral of a customer and take in substitution thereof a paper writing which is not collateral, and which does no more than allow the bank to collect monies due on the collateral and credit it to the account of another. No expert testimony is needed to show the jurors that banks do not ordinarily release a deed of trust that secures a $200,000 promissory note payable to the bank's customer and which has been assigned to the bank as collateral for the customer's loan, and accept as substitute collateral a note secured by a deed of trust,

payable to a party other than the bank's customer, and which is not even assigned to the bank, except, for all practical purposes, for collection. No expert testimony is needed to demonstrate to the jury that by doing what it did in the instant case, the Bank stripped its customer of his security for a $200,000 loan to another party.

*Id.* at 163, 411 A.2d 1090. We concluded:

We think that even if expert testimony is ordinarily needed to prove the standard of reasonable care used by banks in the community in its dealings with its customers, the case now before us is of the type that the average juror would know without expert testimony that banks simply do not ordinarily do what the Appellant Bank did in this case.

*Id.* at 164, 411 A.2d 1090.[40]

Similarly, we conclude that the facts of this case are not of the category requiring expert testimony establishing a "bank-

---

**40.** In its appellate brief, appellant states that the "exact issue" presented to this Court, *i.e.*, whether appellant was required to introduce expert testimony to prove reasonable banking industry standards in order to succeed in its claim against Middleburg Bank, was addressed in *Citizens Bank of Maryland v. Maryland Indus. Finishing Co.*, 338 Md. 448, 659 A.2d 313 (1995). As Middleburg Bank points out, Citizens Bank cannot reasonably be characterized as having addressed the "exact issue" presented by appellant. Rather, the Court of Appeals determined,

whether, for the purposes of a conversion action under Maryland Code (1975, 1992 Rep. Vol.), § 3-419 of the Commercial Law Article, an agent's indorsement on checks payable to the agent's principal were unauthorized (1) when the agent indorsed the checks with an improper motive or later misappropriated the checks, or (2) when the agent omitted restrictive language required by the principal to be part of the indorsement.

*Id.* at 452, 659 A.2d 313.

In our decision in *Maryland Indust. Finishing Co. v. Citizens Bank of Maryland*, 100 Md.App. 671, 685, 642 A.2d 317 (1994), which was vacated by the Court of Appeals and remanded to this Court with instructions to remand to the circuit court, we held that a circuit court erroneously placed the burden of establishing reasonable commercial standards in a conversion claim on the plaintiff under C.L. § 3-419(3), the predecessor statute to C.L. § 3-420, which established an affirmative defense for the bank.

The Court of Appeals did not squarely address this issue, but did observe, in a footnote, that we had erroneously determined that the trial

ing industry practice" in order for the circuit court to determine whether Middleburg Bank breached its duty of care to appellant relative to its payment on the instrument despite the forged indorsement. The check itself contained the following instruction on the back of the check above the indorsement lines: "All Payees must endorse below exactly as written on face of check." Appellant was designated as a payee, on the face of the check, as "Saxon Mortgage Service." The forged indorsement, however, consisted of one word: "Saxon." In addition, Lisa Kilgore, Middleburg Bank's Senior Vice President of Operations, testified as to the contents of what she characterized as "an internal document used for training purposes." According to these training guidelines, a payee should endorse its name exactly as it appears on the front of the check. *See generally Inventory Locator Service, Inc. v. Dunn*, 776 S.W.2d 523, 526–27 (Tenn.Ct.App.1989) (addressing "reasonable commercial standards" as part of the affirmative defense to conversion actions provided in Tennessee's counterpart to the former C.L. § 3–419(3) and observing that, "[w]hile a bank's own procedures cannot in and of themselves be equated with reasonable commercial standards, a bank's failure to follow its own normal procedures is indicative of a failure to act in accordance with reasonable commercial standards.") (internal citations omitted).

We do not perceive the issue of whether a bank violated a standard of care owed to appellant because the bank failed to follow its own internal training guidelines or the express instruction on the check to ensure that the payee's name is endorsed exactly as reflected on the front of the check, to be " 'so particularly related to some science or profession that it

---

court's comments regarding the burden to establish industry standards related to the conversion claim, when, according to the Court, they actually referred to a negligence claim that was also litigated at trial. *Citizens Bank*, 338 Md. at 465 n. 11, 659 A.2d 313. The Court concluded by noting that a plaintiff has the burden of establishing reasonable commercial standards in a negligence claim. *Id.*

It is evident that *Citizens Bank, supra,* does not address the "exact issue" that we now discuss. In any event, appellant, in its reply brief, is notably less fervent about the applicability of *Citizens Bank.*

is beyond the ken of the average lay[person],'" requiring the testimony of an expert to show the degree of care a reasonably prudent bank should have exercised under the circumstances. *Wood v. Toyota,* 134 Md.App. 512, 518, 760 A.2d 315 (2000) (quoting *Hartford Accident and Indemnity Comp. v. Scarlett Harbor Assoc. Ltd. P'ship,* 109 Md.App. 217, 257, 674 A.2d 106, *aff'd,* 346 Md. 122, 695 A.2d 153 (1997) (citing *Virgil v. "Kash N' Karry" Service Corp.,* 61 Md.App. 23, 31, 484 A.2d 652(1984))).

Kilgore also testified that "Saxon appears as an endorsement on the check as a business and abbreviations of businesses are common practice in endorsements for checks." The circuit court was entitled to weigh this testimony against the other evidence adduced at trial to determine whether appellant proved that Middleburg Bank breached a duty to appellant in this case. Nonetheless, the circuit court granted Middleburg Bank's motion for judgment on the negligence claim on the grounds that there was "absolutely no evidence of what the standard is" for the banking industry, following argument during which Middleburg's position on this point was that appellant had presented no evidence regarding the applicable standard of care. Appellant was required to show that Middleburg Bank failed to exercise "that degree of care which a reasonably prudent bank would have exercised under the same or similar circumstances," *Jacques,* 307 Md. at 533–34, 515 A.2d 756. While evidence of an industry standard *may* be proven as evidence of an applicable standard of care, *id.* at 543, 515 A.2d 756, we hold that, under the circumstances of this case, such evidence was unnecessary.

We now turn to the lingering issue of damages. Appellant, in its brief to this Court, neglected to challenge the circuit court's ruling that there was no proof of damages as to the negligence claim. In fact, appellant first addresses this ruling in its reply belief. Ordinarily, we will not consider issues raised for the first time in a reply brief. *Gazunis v. Foster,* 400 Md. 541, 554, 929 A.2d 531 (2007). However, because it is evident that the circuit court based its damages decision, with

respect to the negligence claim, on the analysis that informed its damages determination with respect to the conversion claims—an analysis that we have determined was based on an erroneous interpretation of the law—we shall reverse the circuit court's granting of judgment in favor of Middleburg Bank on the negligence claim and remand for a determination as to (1) whether appellant failed to prove that Middleburg Bank breached its duty of care to appellant and (2) appellant's proof of damages on the negligence count, taking into account the court's factual findings in its ruling on the motions for judgment as to the conversion claims.[41]

**JUDGMENTS OF THE CIRCUIT COURT AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION ON MOTIONS FOR JUDGMENT.**

**COSTS TO BE PAID ONE–HALF BY APPELLANT, ONE–FOURTH BY APPELLEE MIDDLEBURG BANK AND ONE–FOURTH BY APPELLEE CHESAPEAKE BANK.**

---

41. Appellant argues that a plaintiff must prove actual damages in order to obtain recovery in a negligence action. *See Johnson v. Valu Food, Inc.*, 132 Md.App. 118, 126, 751 A.2d 19 (2000). As we have explained, on remand, the circuit court may articulate factual findings as to appellant's "interest" in the check, or the actual loss sustained by appellant, for purposes of granting or denying judgment on appellant's conversion claims. Those findings may have a direct bearing on whether appellant has sufficiently established damages as to its negligence action.